**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 2238 VICTORY CORP.<br>DISPLAY NAME: WHOISCAMERA<br>2238 VICTORY BLVD<br>STATEN ISLAND NY 10314<br><br>        Plaintiff,<br><br><br>        v.<br><br>FJALLRAVEN USA RETAIL, LLC<br><br>C/O ITS REGISTERED AGENT<br><br>C T CORPORATION SYSTEM<br><br>28  LIBERTY ST.<br>NEW YORK, NEW YORK, 10005<br><br>AND<br><br>NETRUSH, LLC<br>C/O ITS REGISTERED AGENT<br>CHRISTOPHER MARANTETTE<br>17800 SE MILL PLAIN BLVD<br>STE 120<br>VANCOUVER, WA  98683-7586<br><br>        Defendants. | Case No.  19-11733<br><br><br>**COMPLAINT FOR DAMAGES<br>(15 U.S.C. §§ 1, 15 and Common<br>Law Tort)**<br><br>**(JURY TRIAL DEMAND,** *infra***)** |

        Plaintiff  2238 Victory Corp, Display Name: Whoiscamera (pronounced "Who

Is"), brings this action under (i) the Sherman Act, 15 U.S.C. 1, 15 et seq., for

damages, (ii) the law of New York for tortious interference with contract and

prospective economic relations and for libel per se, and (iii) Declaratory Judgment

Act, 28 U.S.C. 2201 to declare the legal relations of the parties hereto,  based upon

its personal knowledge as facts pertaining to it, upon the investigation of its

counsel, and upon information and belief.

### NATURE OF THE ACTION[1]

1.   This case is about greed disguised as "brand protection."  With the advent of

Amazon has come a fight for the right (or wrong) to display goods in the

ecommerce space owned and controlled by Amazon, i.e. amazon.com.  A

former Investigation Specialist for Amazon's Seller Performance team, Chris

McCabe, has written about the misuse of the Amazon rights reporting system.

In his article, "Have you noticed How Unpredictable Amazon's Notice

Infringement teams are now?" https://www.ecommercechris.com/have-you-

noticed-how-unpredictable-amazons-notice-infringement-teams-are-

now/(February 21, 2019), Mr. McCabe observes (Exhibit 1):

_____

[1] On May 21, 2007, the Supreme Court decided *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,
127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007), in which it considered "what a plaintiff must
plead in order to state a claim under § 1 of the Sherman Act."  Since *Twombly,* the course of
antitrust litigation has been uniformly predictable, with defendants conducting microscopic
studies of what they invariably conclude are "threadbare allegations." In light of the foregoing,
we will provide the context of Amazon's alleged wrongdoing at some length.

- Amazon's Notice Claim of Infringement Teams exist in theory to process intellectual property violations on the Amazon Marketplace at amazon.com;
- In practice, trademark and other violations can come from anywhere, allege anything, and are rife with abuse;
- The work of the Notice teams, though attempting to combat rampant abuse, has backslided of late to the point where Amazon's response to contested Intellectual Property Complaints makes "little to no sense;"
- Amazon harshly enforces the brand owner complaints of counterfeiting by requiring at most that brand owners attest to having "test bought" the allegedly counterfeit product from the alleged counterfeiter;
- Suspensions and expulsions from the Marketplace follow "bizarre behavior" on Amazon's part, where the reasons for adverse actions are highly mercurial, *re*stated repeatedly, and often have nothing to do with the reason for the suspension or expulsion; and
- Accused sellers—in particular those with a history of notice claims (as many sellers have)--are left in a virtual "twilight zone" where they are not told and cannot learn the true reasons for harsh—at times lethal—action taken against their businesses.

2.  Unscrupulous brand owners, well aware of the above Notice Infringement landscape, take unilateral and concerted actions with co-conspirators, often "brand protection services," to assist in "knocking off unwanted sellers."  *Id.*

3.  Plaintiff WhoIs, a Staten Island, New York business,  operated within a market niche that serves as a valuable, efficient segment of the economy. Succinctly, the model is sourcing products at wholesale, from an authorized distributor of a manufacturer, or from that authorized distributor's direct purchaser,  and selling it at an enhanced, retail price point online, but often

3

at a cheaper price than other sellers are selling it, thus benefiting customers,
who get authentic product at a discount.

4. Such discounting threatens the profits of manufacturers who attempt to
maintain a system of Minimum Advertised Pricing.  See T. Johnson,
Minimum Advertised Price (MAP) Violations & Policing Your Brand on
Amazon, athttp://www.cpcstrategy.com/blog/2015/05/minimum-advertised-
price-map-violation-amazon/

5. Manufacturers, their "authorized distributors," and their "brand protectors"
often seek means—some unlawful-- to eliminate such niche, lawful market
competition.[2]  Elimination of discounters and discounted products from access
to the Marketplace by joint collaborative action, directly at issue here, is a per
se violation of the Sherman Anti-Trust Act.  *United States v. Gen. Corp*., 384
U.S. 127, 129, 86 S. Ct. 1321, 1322 (1966) ;  *United States v. Apple, Inc.,* 791

---

[2]A copyright or trademark holder enjoys a "distribution right" and may initially sell, or not sell,
copies of a copyrighted or trademarked item to others on such terms as he or she sees fit.
However, the IP holder's exclusive distribution right is limited to the first sale of the coyprighted
or trademarked item. Under the "first sale" docrine, codified at 17 U.S.C. § 109(a) "the
distribution right may be exercised solely with respect to the initial disposition of copies of a
work, not to prevent or restrict the resale or other further transfer of possession of such copies."
The Fair Use Doctrine, similar to the First Sale Doctrine, permits a seller to use a another's
trademark to identify the former's goods, provided that no likelihood of confusion results as to
the source of the product or the trademark holder's sponsorship or affiliation.  15 U.S.C.
§115(b)(5)(A)-(C). The First Sale Doctrine [also] protects resellers of genuine trademarked
goods from claims of infringement. *Davidoff & CIE, S.A. v. PLD Int'l. Corp.,* 263 F.3d 1297,
1301 (11th Cir. 2001); *Hidalgo Corp. v. J. Kugel Designs, Inc*., No. 05-20476-CIV-
JORDAN/TORRES, 2006 U.S. Dist. LEXIS 96647, at *12 (S.D. Fla. 2006)

F.3d 290, 322 (2d Cir. 2015); *Feminist Women's Health Ctr., Inc. v. Mohammad*, 415 F. Supp. 1258 (N.D. Fla. 1976)

6. Plaintiff  buys product in the manufacturer's original packaging and does not repackage, modify, or otherwise change the product for resale—not one iota.

7. Plaintiff  brings this Antitrust action following its commercial and financial ruination resulting from Defendants' successful conspiracy to exploit Amazon's Notice Infringement protocols and thereby eliminate price competition—specifically, defendants' libelous statements to Amazon predictably causing plaintiff's expulsion from the Amazon Marketplace.

8. Plaintiff also sues in tortious interference under the common law because defendants' actions decimated plaintiff's prospective business relations with Amazon and impaired plaintiff's enjoyment of the plaintiff-Amazon which had been in continuous effect for 9 years prior to defendants' wrongful conduct at suit.

Commented [ms1]:

9. Because Defendants acted in concert to destroy WhoIs and the actual competition it represented, were successful in so doing, and thereby lessened competition in trade or commerce and caused plaintiff grievous damage, this particular tort case is prosecuted under the Sherman Antitrust Act, 15 U.S.C. §1 et seq. for treble damages.

## JURISDICTION AND VENUE

10. Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against  Fjallraven USA Retail, LLC and Netrush LLC as a result of their violations of the antitrust laws.

11. This Court has subject matter jurisdiction over plaintiff's antitrust claims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as 28 U.S.C. §§ 1331 and 1337(a).

12. This Court has supplemental jurisdiction over plaintiff's common law claims pursuant to 28 U.S.C. § 1367, and diversity jurisdiction over those claims pursuant to 28 U.S.C. § 1332 because (i) Fjallraven is a citizen of Colorado and has its flagship store in Manhattan, New York.  Fjallraven registered with the New York Secretary of State on March 4, 2015 as a Colorado limited liability company.  (DOS ID #4719868), establishing its Registered Agent for Service of Process as CT Corporation System, 28 Liberty St., New York, New York 10005, and (ii) Netrush.com, Inc. is a Delaware corporation with its principal place of business in Vancouver, Washington and has acted as Fjallraven's agent in developing and implementing the conspiracy at suit.

13. The amount at controversy exceeds $75,000.

6

14. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391 (b), (c) and (d) because Defendant Fjallraven is found in and has its flagship store in Manhattan, New York City, has agents in this district and transacts business in this district.

15. Defendant's activities were within the flow of, were intended to, and had a substantial effect on, interstate commerce because Plaintiff conducted business all over the country.

16. The Court has personal jurisdiction of defendants for Clayton Act  purposes because their suit-related activities occurred within the United States. Separately as to the common law claims, the Court has personal jurisdiction of defendants because they made test purchases of product from plaintiff in New York, and such transaction of business in New York had a substantial relationship to the state law tort claims herein.  CPLR 302(a)(1). Specifically, by test purchasing from plaintiff, receiving and examining Fjallraven products, defendants had knowledge of the falsity of their statements to Amazon and, by virtue of such false statements, plaintiff will show defendants' intent to harm plaintiff which, in fact, their statements did. *Licci v. Lebanese Can. Bank, SAL,* 20 N.Y.3d 327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (2012).

PARTIES

17. WhoIs, a New York corporation, became a third-party seller on Amazon in November 2010 and operated continuously thereafter until the events at suit.

18. Fjallraven is a citizen of Colorado and has its flagship store in Manhattan, New York.

19. Netrush.com, Inc. is a Delaware corporation with its principal place of business in Vancouver, Washington .

**AMAZON AND MARKETPLACE SELLERS**

20. Pursuant to Amazon's standard Business Solutions Agreement, third-party sellers provide content for product offerings, and are responsible for ensuring that the provided content and products are lawful.[3]

21. When a third-party seller wants to offer a product for sale on amazon.com, the seller must first determine whether the product already exists in the amazon.com catalog. (ASIN Creation Policy).[4]  Multiple sellers can offer the same product for sale. If the same product already exists in the catalog, the seller can add specific details – including price and product condition and any

---

[3] Many of the factual allegations in of the Complaint are substantially quoted from a Declaration of Jonathan Schelle in Support of Motion for Summary Judgment, submitted by *Amazon in Lasoff v. Amazon.Com, Inc*., No. 2:16-cv-00151-BJR (W.D. WA  12/5/16), Docket No. 50.
[4] Each unique product offered for sale on amazon.com is assigned an Amazon Standard Identification Number ("ASIN").

additional product details – and their offering is listed, along with other sellers of the same product, on or a click away from the same product detail page.

22.   If the product is not already in the catalog, a third-party seller can create a new product listing. To do so, the seller must send Amazon, via an automated file upload system, content related to the new product, including the product description, an image of the product, and the product's price.

23.   This seller-supplied content is then used to automatically generate a "product detail page."[5] The third-party seller is responsible for the uploaded content, and specifically represents and warrants that it has the right to grant Amazon a license to use all seller-provided content, trademarks, and other materials.

24.   Amazon represents that its role with respect to seller-submitted content and product offerings is limited and passive.  Amazon represents that it does not suggest prices for third-party offerings, or generally involve itself in third-party sales except to set parameters on terms and conditions of use.  Those parameters include a third-party seller's agreement to be bound by Amazon's policies, including acknowledgment that "[p]roducts offered for sale on Amazon.com must comply with all laws and regulations and with Amazon's policies."  Under Amazon's Intellectual Property Violations Policy, third-

---

[5] A "product detail page" is a webpage that displays the product offering in the amazon.com marketplace, including the product name, photos, and description.  *Id.* ¶ 9

9

party sellers are responsible for ensuring that the products they offer for sale

are legal. ("Sellers are responsible for ensuring that the products they offer are

legal and authorized for sale or re-sale."). All products offered by third-party

sellers are owned by the third-party sellers, not Amazon.

25.     Amazon's policies explain that sellers may list their products for sale against

pages that another seller has created with one proviso, namely, that <u>they are

selling the same product</u>:

> **Detail Page Ownership and Image Restrictions:** When
> a detail page is created, it becomes a permanent catalog
> page on Amazon.com that will remain even if the
> creator's inventory sells out. Additionally, when you add
> your copyrighted image to a detail page, you grant
> Amazon and its affiliates a nonexclusive, worldwide,
> royalty-free, perpetual, irrevocable right to exercise all
> rights of publicity over the material.
> Other sellers can list their items for sale against pages
> that you have created or added your copyrighted images
> to. However, we do require sellers to list only against
> detail pages that exactly match their items. If you believe
> sellers are listing against detail pages that do not exactly
> match their items, we ask that you report the violation
> directly by using the <u>contact us form</u>.

26.     Allowing all sellers to list the same product on the same page generates

intense price competition that is highly beneficial to consumers, who

understand that Amazon presents the Marketplace's entire array of a given

ASIN on the same product detail page.  Eliminating low-priced competitors is

injurious to competition and to consumers.  Many or most online buyers view

10

Amazon as one-stop shopping and look no further.  Such consumer behavior is fundamental to Amazon's business plan.

27.   Amazon's policies expressly prohibit third-party sellers from violating the intellectual property rights of others.  If a product listing is determined to be counterfeit, expired, defective or otherwise inferior to the ASIN, to be in violation of third-party intellectual property rights, or to otherwise violate Amazon's policies, Amazon may block the listing or, in certain circumstances, terminate the third-party seller.  Before it can act, Amazon must, according to its own written policies, determine whether the reported item or items do actually infringe on another seller's rights.  To do so, Amazon represents to the public that it conducts an investigation, typically by asking the reporter of the alleged infringement to establish their intellectual property rights, to conduct test purchases of the allegedly infringing products, and to provide Amazon with material differences between the reporter's product(s) and the alleged infringer's product(s). Amazon publicly holds out that it requires evidence of infringement for each product that it is asked to take down, as it cannot assume that because one product is infringing, all of that seller's products are infringing.  Part of the basis of this litigation is Amazon's laxity in implementing the foregoing procedures and protocols it publicly holds out as applicable to claims of product counterfeiting, thereby

11

allowing unscrupulous Rightsowners and those purporting to be Rightsowners to accomplish  a purpose of limiting price competition regardless of product authenticity.

28.   Amazon knows that many or most of the infringement complaints it receives from complaining sellers are falsely premised upon the notion that grey market goods may not be sold using intellectual property belonging to a remote manufacturer or other Producer.  Amazon has testified to this matter before the United States House of Representatives  (see ¶63 *infra)*. Nevertheless, Amazon acts upon such ill-conceived infringement complaints, thereby stifling Marketplace competition.  The protocol is routine, institutionalized and at times lethal to competition and potential competition.

### SUMMARY OF AMAZON'S COMPETITIVE LANDSCAPE

29.   Amazon now controls 47% of all e-commerce in the United States, capturing nearly $1 of every $2 Americans spend shopping online.[6]

30.   Industry leaders have called Amazon a "monopoly hiding in plain sight.[7]

31.   Amazon has positioned itself at the center of e-commerce and now serves as **essential infrastructure** for third party sellers in the United States, virtually all of whom that depend upon it.

---

[6] https://www.emarketer.com/content/digital-investments-pay-off-for-walmart-in-ecommerce-race
[7] A. Gara, Why One Amazon Bull Thinks Jeff Bezos Is Building A $3 Trillion Company, Forbes (May 4, 2016), reprinted

32. The relevant market of online retail sales (and narrower relevant markets contained therein) is recognized universally as a discrete area of competition, with no rivals to Amazon.[8]

33. When Amazon grants or terminates Marketplace selling privileges to a seller, it impacts the nature of relevant market intra-brand and inter-brand competition in the products and category(ies) of products, as the case may be, that the seller seeks to market in the Marketplace.

34. Amazon is generally permitted to unilaterally restrict any seller from competing in the Marketplace and take such other unilateral actions as Amazon in its business judgment deems appropriate; but other market participants are *not* free to agree to restrict or exclude from competition another seller or such seller's relevant products.  Such concerted behavior, which is the subject of this action, is *per se* unlawful if done for the purpose of eliminating competition. restricting output, or stabilizing anticompetitive pricing.

**THIRD-PARTY SELLERS' LISTING AND SALE OF GREY MARKET GOODS**

35. Netrush expresses its first priority in its mission as "Unauthorized seller and grey market strategy development and guidance."  See ¶56, *infra.*

---

[8] https://www.fool.com/investing/2016/09/26/how-amazon-is-crushing-ebay-and-wal-mart.aspx

36. The grey market, also referred to as the parallel market, is a market where a product is bought and sold outside of the manufacturer's authorized trading channels, for example, plaintiff's sales of Fjallraven backpacks.

37. Third party sellers on Amazon typically purchase goods only to resell them on the Marketplace for a profit.  Sellers not in privity with manufacturers or other Rightsowners may undercut other Sellers, including those who have intellectual property rights embedded in grey market products being marketed. Producers and their "authorized dealers," in particular, are thus incentivized to eliminate undercutting sellers, both to retain value perceptions in the public marketplace for "their" products and, more immediately, protect profit margins on the Marketplace.

38. As stated in Amazon's policies quoted above, it is completely lawful for third-party sellers to purchase grey market goods and sell them on Amazon. Indeed, such products are by design placed on the same product detail page often created by a trademark holder, copyright holder, or affiliate.  Amazon's established policy is that such products may be offered alongside a rightholder's offering—indeed, such goods may create the catalogue page-- as long as the third party seller's offering is "<u>the same product</u>" as described in by brand, name, ASIN, etc.

39.   Well-established doctrines make clear that trademark and copyright laws do
      not prevent the purchasers of trademarked or copyrighted items from re-
      selling them without permission from the owner of the trademark or
      copyright.  The First Sale Doctrine permits one who has acquired ownership
      of a copy to dispose of that copy without the permission of the copyright
      owner.17 U.S.C. § 109   The Fair Sale (or "First Use") Doctrine also permits a
      defendant to use a plaintiff's trademark to identify plaintiff's goods so long as
      no likelihood of confusion results as to the source of the product or the
      trademark holder's sponsorship or affiliation (e.g. "authorized dealer").  15
      U.S.C. §115(b)(5)(A)-(C). The first sale doctrine [also] protects resellers of
      genuine trademarked goods from claims of infringement. *Davidoff & CIE,
      S.A. v. PLD Int'l. Corp.,* 263 F.3d 1297, 1301 (11th Cir. 2001); *Hidalgo Corp.
      v. J. Kugel Designs, Inc.*, No. 05-20476-CIV-JORDAN/TORRES, 2006 U.S.
      Dist. LEXIS 96647, at *12 (S.D. Fla. 2006)

40.   The Marketplace is thus routinely presented with multiple sellers of the same
      product on the same page, as specifically provided in the BSA and Amazon
      formal policies.

## STATEMENT OF FACTS

### A. WhoIs: History of Success without Controversy

41. To become an Amazon seller WhoIs executed Amazon's standard Business Solutions Agreement that, among other things, allowed Amazon to terminate WhoIs as a seller for any reason or for no reason at all.  One of the conditions of the BSA was plaintiff's adherence to Amazon's policies, such as its anti-counterfeiting policy.

42. WhoIs routinely listed approximately 70 brand names on amazon.com, and sold over 500,000 units of product to customers on Amazon with a 98% lifetime positive feedback rating.  Plaintiff experienced $5,739,547.36 million in sales during its last six months of Amazon operations, at 26% net margin, or $1,492,282. 31in profits, i.e. monthly profits of approximately $250,000.  Of the approximate 70 brands WhoIs listed during its last six (6) months of operations, virtually all of which are identified by intellectual properties such as patents and trademarks, Fjallraven is the only owner of such intellectual properties ("Rightsowner" or "RO") to complain to Amazon of counterfeiting ("IP complaint").  Indeed each defendant thus complained or participated in complaining to Amazon on 16 separate occasions.  As a direct result of such IP Complaints, Plaintiff's once-thriving Amazon business is now a remnant of its former self.

16

43. Whilst selling on Amazon plaintiff offered many of Fjallraven's backpacks, all completely authentic, at prices below Fjallraven's MAP pricing.  Indeed plaintiff sold approximately 2880 Fjallraven items between February 24th and October 17, 2019 at highly competitive prices.

44. Fjallraven never complained—not once-- of plaintiff's said listings or sales until it came under Netrush influence in the spring of 2019.  At that point Netrush/Fjallraven dealt plaintiff a death blow.

### B. Fjallraven: the Best of its Class

45. **Fjällräven** (Swedish pronunciation: [²fjɛlˌrɛːvɛn], Swedish for "The Arctic fox") is a Swedish company specializing in outdoor equipment—mostly costly clothing and backpacks.  Today among its more well-known products are Greenland jackets, Vidda Trousers, Expedition Down Jacket, and various versions of the *Kånken* rucksack.  A rucksack is a bag with shoulder straps that allow it to be carried on someone's back, typically made of a strong, waterproof material and widely used by hikers; a backpack.

46. The Fjällräven Kånken is Fjällräven's best-selling product. It was originally developed as a reaction to the increasing number of reports that Swedish school children were developing back problems from their more traditional bags. The lightweight and rectangular yet spacious backpack, which was released in 1978, was Fjällräven's attempt to solve this problem. During its

17

first year in production, 400 copies were sold, increasing to 30,000 the

following year. The large variety of color combinations let the customer

personalize their bag to reflect their own individuality. By 2008, over three

million Kånken daypacks had been produced with 200,000 being made each

year.   As of April 2018, Fjällräven sells the Kånken in 54 different colors.

47. Fjallraven's Classic Backpack is by far the best selling backpack within this

best-selling backpack group, in its price group on Amazon.

https://www.amazon.com/Best-Sellers-Backpacks/zgbs/fashion/360832011

(last visited 12/8/19)

### C. Netrush.com, Inc: Primary Cause of this Dispute

48. Netrush.com, Inc. was founded as a third-party seller on the Amazon

marketplace in 2006.

49. Eventually Netrush transitioned to a company with a diverse set of digital

and supply chain capabilities and established itself as an industry leader in e-

commerce marketplace services.

50. The Netrush model relationship is that of exclusive Amazon seller of strong

brands, or certain elements of a brand's market offerings, e.g. Leatherman,

Tile, and Sorel. Indeed, by 2016 Netrush was an exclusive Amazon seller for

18

dozens of brands on the Marketplace.[9]

https://www.columbian.com/news/2016/jun/05/netrush-carves-out-niche-helping-businesses-pitch-their-goods-on-amazon/

51. In 2015 Netrush enjoyed revenues of $59.4 million with 50 employees, *id.*, and grew meteorically such that in 2018 Netrush had revenues of $147.5 million with 187 employees.  https://www.owler.com/company/netrush

52. But Netrush does something that few if any other third-party sellers do for their manufacturer/suppliers, namely, Netrush provides "Brand Control & Compliance Services."  Indeed, Netrush is best known for its expertise in "MAP compliance and violation monitoring," particularly on Amazon:

> ***Netrush is a retailer/agency hybrid*** that actively manages leading brands on the Amazon platform. ***Netrush*** teams provide long-term solutions that sustain a brand's health and drive growth on the Amazon marketplace through optimized content, marketing, design, supply chain management, and premium packaging. https://webcache.googleusercontent.com/search?q=cache:8wqUaFP1s xoJ:https://netrush.com/blog/netrush-welcomes-sports-outdoors-director-ryan-riggs/+&cd=4&hl=en&ct=clnk&gl=us&client=safari

53. Netrush itself expresses its "brand control and compliance" role as follows:

> We help you know exactly when your policies are violated, and give you the roadmap to take action, helping not only your Amazon performance, but your brand integrity across all retailers.

---

[9] As of December 8, 2019 Netrush's store on Amazon listed 51 "Top Brands." https://www.amazon.com/s/other?pickerToList=brandtextbin&qid=1575831365&me=A2G7B63FOSFZJZ&ref=sr_sa _p_4

54. Christopher Marantette, President and CEO of Netrush, describes Netrush on

his Linked-in page as:

> NetRush started as a third party retailer in 2006 and has evolved
> into an agency that partners with brands to make Amazon an
> extension of their business. Today, we create solutions that
> sustain a brand's health, drive growth, and proactively manage
> the Amazon marketplace.

55. When Netrush promises "the roadmap to take action," in means in

significant part a scheme whereby it monitors ecommerce to identify sellers

who sell Fjallraven products below MAP; and it and causes the filing of

false complaints, i.e. IP Complaints sounding in counterfeiting, with

Amazon in sufficient number to assure that the discounting seller's listing of

Fjallraven's products are "taken down."  Often, as with plaintiff, the

consequence of the Netrush "roadmap to take action" is a seller's expulsion

from the Amazon Marketplace, in an instant destroying years of hard work

in building an ecommerce store.

56. Netrush bullet points its "brand control and compliance" in terms both

euphemistic and quite stark:

- Unauthorized seller and grey market strategy development and
  guidance
- Internet authorization policy development

20

- MAP compliance and violation monitoring
- Amazon Brand Registry management

57. Netrush's  MAP Compliance services lay at the heart of this case. Specifically, Netrush ascended to be Fjallraven's exclusive authorized Amazon seller by virtue of the parties agreement and understanding that, at least as to Amazon sales, Netrush would keep Fjallranven's Kanken rucksacks at MAP by directly or indirectly causing the listings of lower-priced, competing sellers to be "taken down."

### D. Circumstances of Plaintiff's Injury

58. Until approximately June of 2019, one Sam Minnasian served as Fjallraven's Digital marketing Manager and Director of Ecommerce and digital Marketing for five years.  In or about June 2019 Mr. Minassian took leave of Fjallraven, but no direct replacement was engaged.  Certain of his tasks were delegated to a young woman, one Hannah Stroot, whose title is Ecommerce Manager.

59. Simultaneously in or about the spring of 2019, Netrush appeared on the scene as both exclusive *authorized* Fjallraven Amazon seller AND  as Fjallraven's Amazon-related specialist in eliminating low-priced competition and maintaining MAP.

60. Fjallraven itself holds Netrush to be its exclusive authorized seller on Amazon:

> I called fjallraven customer service and they confirmed that netrush was their only verified seller on amazon.
> https://www.amazon.com/ask/questions/Tx2FWK0AD9BN1OR
> (August 19, 2019)

61. While there are often other sellers of Fjallraven backpacks on Amazon, Netrush has an "exclusive" position as to approximately 75 backpacks, including those most popular.  Other purchasers are not assured of supply and have been and will be promptly eliminated if they violate Fjallraven's MAP pricing.

62. Netrush's bullet point no. 3 (¶56 above), to wit: "MAP compliance and violation monitoring," is a significant misnomer because there is no violation as to independent third party sellers who are not contractually related to Fjallraven.

63. Indeed, Amazon testified on this misnomer before the United States House of Representatives, focusing on Rightsowners' misconception vis-à-vis sellers such as plaintiff, stating that "competitive prices" depend upon the "unauthorized sellers'" ability to sell authentic products: [10]

---

[10] http://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf

Amazon seeks to provide its customers with the widest possible selection of products at competitive prices. One way Amazon has sought to provide this selection is by making it easy fo sellers of authentic products to open selling accounts and sell a wide variety of products directly to Amazon's customers in Amazon's store. Brands often conflate the question of whether goods are authentic (not counterfeit) with whether a particular seller is "authorized" (meaning they have a contract with the manufacturer). There are many legal sources of authentic supply in addition to resellers specifically authorized by the brand. These include liquidation or sale by authorized retailers, and supply from other wholesalers and distributors—who are sometimes also used by brands themselves to move merchandise. Amazon goes to great lengths to assure the authenticity of products, preventing bad actors from opening selling accounts or selling counterfeit products in its store. But, we do not require that sellers have a direct contractual relationship with a product's manufacturer, as doing so could prevent sellers—many of whom are small and medium sized businesses—from legally selling these products in our store at competitive prices.

64. Netrush's pitch to brand owners includes assurances that Netrush can and will scale the logistics, both with Amazon and the brand, of promptly eliminating sellers of branded products at below MAP.  Until discovery plaintiff will not know the contents of early Netrush-Fjallraven communications, but other brands attest to such assurances in being recruited by Netrush.

65. Soon after Netrush joined Fjallraven, on or about September 13, 2019, defendants filed against plaintiff 16 IP complaints for Fjallraven products. These complaints purported to be filed by sam.minnisian@fjallraven.com. Plaintiff was  expelled from the Amazon platform on October 21, 2019 as a direct result of those IP complaints.

66. The only way to obtain a reprieve from this death blow was to obtain Fjallraven's imprimatur.  It is a fact of common knowledge that once an IP

complaint is lodged with Amazon, accompanied by the required declaration

of the complainant attesting to a test-purchased product being counterfeit,

that Amazon's policy is to not reverse an expulsion without a retraction or

letter from the Rightsowner completely absolving the accused seller.  This

procedural quagmire is the fulcrum of the conspiracy at suit:

> How do I reactivate my listing?
>
> Please provide one of the following to reactivate your listings:
>
> 1) A retraction of the report from the rights owner:
> -- Sam Minassian
> -- sam.minassian@fjallraven.us
> 2) An invoice or letter of authorization from the manufacturer or
> Rights Owner verifying the product's authenticity to notice-
> dispute@amazon.com. External links are not accepted. For security
> reasons, we only accept attachments in the following file formats:
> .jpeg, .jpg, .pjpeg, .gif, .png, .tiff,

67. Netrush (Christopher Marantette, President and CEO) had test purchased

plaintiff's Fjallraven products and either filed the IP complaints with

Amazon or instructed Fjallraven to do so as part of the Netrush "grey market

strategy" and "roadmap to take action."  See ¶¶53,56, *supra.*

68. Plaintiff made dozens of calls and wrote numerous emails to Fjallraven

directly, unaware—as plaintiff would soon learn--that Mr. Minassian was no

longer employed by Fjallraven, i.e. his name had been used without his

authority to shield the true wrongdoer.

24

69. Finally, plaintiff spoke directly with Sam Minassian through Linked In,

However, Mr. Minaissian  insisted that he left Fjallraven in or about June

2019 and was not responsible for the IP complaints.  He commiserated with

plaintiff and offered to help plaintiff find the "best point of contact" to

resolve the matter.  Evidently, after contacting Fjallraven Mr. Minaissian

was unable to provide such a contact person despite his commitment to do

so.

70. Plaintiff remained expelled from the Amazon Marketplace until December

5, 2019 after paying consultants over $10,000 to get Amazon to hear

plaintiff's explanation of Fjallraven's outrageous conduct.  The IP

complaints, however, remain as a blight on  plaintiff's account . . . an ever-

present threat should adverse circumstances arise beyond plaintiff's control,

e.g. another unscrupulous seller's IP complaint.

### E.  Effect on Competition

71. Plaintiff's competition in the Fjallraven space was eliminated and prices for

Fjallraven backpacks have been stabilized at artificially high, i.e.

anticompetitive  levels.  Output has been restricted.  Consumers have thus

been harmed.

72. Plaintiff is the only efficient enforcer to address the Netrush/Fjallraven

conspiracy and obtain the relief sought herein because plaintiff was directly

25

injured by the conspiracy, no other seller was injured by seller's misfortune, no other party would enforce the rights sought to be enforced herein, and there is no other party entitled to any part of the damages sought to be recovered herein.

## COUNT I
### (Per se Violation of the Antitrust Laws)

73.  The averments of paragraphs 1 through 72 are repeated and realleged as if fully set forth herein.

74.  The conduct of Netrush and Fjallraven as described herein constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, 15, which prohibits contracts, understandings and conspiracies in unreasonable restraint of trade.[11]

75.  Elimination of discounters and discounted products from access to the Marketplace by joint collaborative action, directly at issue here, is a *per se* violation of the Sherman Anti-Trust Act.  *United States v. Gen. Corp.*, 384 U.S. 127, 129, 86 S. Ct. 1321, 1322 (1966) ;  *United States v. Apple, Inc.,* 791 F.3d 290, 322 (2d Cir. 2015); *Feminist Women's Health Ctr., Inc. v. Mohammad*, 415 F. Supp. 1258 (N.D. Fla. 1976).

---

[11] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

76. As set forth above, Netrush and Fjallraven have, in concert, established definitive exclusionary methodologies to preclude plaintiff from competing or effectively competing in the Marketplace.

77. The defendants "spread lies" about plaintiff, to Amazon, as an essential aspect of the conspiracy.  Such unseemly conduct is the hallmark of an unlawful marketplace presence.

78. All of the foregoing accounts of actual commercial activity plausibly evince a unity of purpose, a common design whereby competition is restrained via joint collaboration to serve conspirators' economic interests and not for any procompetitive reason.

79. Plaintiff lost profits by reason of being expelled from the Amazon Marketplace.  Indeed, Plaintiff's sales during 2018 were up 300% from 2017, indicating that being offline during Q4 was particularly injurious.

80. Further, plaintiff was further damaged as follows:

   a. $515,173.95 in marketing dollars for products to achieve ranking on proprietary pages that WhoIs created, and because of being taken  down for so long, all the pages lost their ranking and WhoIs must essentially start over again on them;

   b. Storage Fees – When an account is suspended, the suspended seller does not make any sales, yet storage fees are still incurred while goods are being held until account is reopened. Amazon Storage fees are also 3x higher during 4th quarter. Plaintiff spent $122,000.00 in storage fees for naught;

   c. Plaintiff spent $18,300.00 for consultants who work on getting accounts back, by writing Plans of Action ("POA's") and reviewing the accounts; and

   d. Because Plaintiff is restricted from selling Fjallraven products, it has dead inventory of $100,000.

27

## COUNT II:

### (Interference with Existing and Prospective Business Relationships)

81. The averments of paragraphs 1 through 80 are repeated and realleged as if fully set forth herein.

82. In order to state a claim for tortious interference with prospective economic advantage, a claimant must plead facts sufficient to demonstrate that she had "(1)...business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and  (4) defendant's acts injured the relationship." *Catskill Development L.L.C. v Park Place Entertainment Corp.,* 547 F.3d 115, 132 (2d Cir. 2008); See also *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114 (2d Cir. 2010).

83. As of September 13, 2019 plaintiff was a third-party seller on Amazon and thriving.   Experts believe that Amazon third-party sellers who pass a threshold of <$1MM in annual sales, known as "Top Sellers" (such as WhoIs), have considerable longevity in their Amazon business relationship. See https://www.marketplacepulse.com/articles/veteran-amazon-sellers-still-at-the-top

84. Defendants accusations of counterfeiting, made directly to Amazon, were for

28

the improper purpose of suppressing competition; and those actions interfered with plaintiff's business relationship with Amazon and proximately caused expulsion.

85. Defendants accusations were false and defendants knew they were false at relevant times. Defendants statements were made maliciously and with ill will, as business entities do not lie about competitors absent a strong measure of ill will.

86. Amazon stated that it took defendants accusations very seriously and expelled plaintiff as an Amazon third-party seller after receiving 16 IP Complaints.

87. Amazon stated that it would act favorably if Fjallraven would retract its accusations; but, despite dozens of calls, emails and all manner of attempted rectification, plaintiff was ignored and left, literally, with no one to talk to.

88. Defendants' acts destroyed plaintiff's relationship with Amazon, thereby causing the shutdown of plaintiff's business from October 21, through December 5, 2019.

### COUNT III:

### (Libel Per Se)

89. The averments of paragraphs 1 through 88 are repeated and realleged as if fully set forth herein.

90. The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) "of and concerning" the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege."  Under New York defamation law, the Courts have distinguished "a limited category of statements" that are considered "libelous *per se* which do not require pleading and proof of special damages." *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985).

91. Defendants' scheming accusations falsely charged plaintiff with a serious crime or crimes, to wit: counterfeiting, a form of fraud, undertaken by means of interstate wire services, itself a Federal felony.  18 U.S.C. §1343.

92. Defendants' accusations against plaintiff to Amazon directly injured said plaintiff in its business and trade because, as defendants knew, Amazon will not tolerate repeated counterfeiters as Amazon sellers.

93. Defendants' accusations against plaintiff constitute libel *per se.*

94. Although injury may be presumed due to libel *per se,* plaintiff suffered above and beyond presumed damages, e.g. loss of enterprise value and income.  In particular, plaintiff lost good will specific to the plaintiff-Amazon relationship that cannot be recovered including, *inter alia,* plaintiff's

right to sell a broad range of products on amazon.com, much of which entitlement was grandfathered.[12]

### JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, 2238 Victory Corp. Display Name Whoiscamera demands judgment in its favor, together with the following relief:

1. Damages in an amount to be determined at trial.

2. The trebling of damages under the antitrust laws.

3. Alternative to treble damages, punitive damages for tortious interference.

4. Such other and further relief as the Court deems just and proper.

/s/Mark Schlachet_____
Law Offices of Mark Schlachet
3515 Severn Road
Cleveland, Ohio 44118
Telephone: (216) 225-7559
Facsimile: (216) 932-5390
Email: markschlachet@me.com

Attorney for Plaintiff 2238 Victory Corp

---

[12] As an established third-party seller, plaintiff was entitled to sell many products that a new seller would be precluded from selling based upon Amazon's "gating" and other restrictions.